# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JULIANA MARIE M.,[1]

                                 Plaintiff,

        v.                               1:18-CV-1421
                                         (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                 Defendant.

---

JOSEPHINE GOTTESMAN, ESQ., for Plaintiff
JASON P. PECK, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on June 13, 2015, alleging disability beginning April 24, 2015. (Administrative Transcript ("T") at 34, 229-30). Her applications were denied initially on August 13, 2015. (T. 96-100). Plaintiff requested a hearing, which was conducted by Administrative Law Judge ("ALJ") Sharda Singh on June 14, 2017, at which plaintiff and Vocational Expert

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

("VE" ) Linda A. Stein testified. (T. 55-83). At the end of the hearing, plaintiff amended her date of onset to July 1, 2016. (T. 82).

In a decision dated October 31 2017, the ALJ found that plaintiff was not disabled. (T. 10-24). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 16, 2018. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner]

next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was 52 years old at the time of the ALJ's hearing,[2] was married, and lived with her husband and their nine-year-old son. (T. 66). She has a Bachelor's degree in nursing, and she has past relevant work experience as a registered nurse, a case manager, and most recently, as a hospice nurse-liaison. (T. 72, 304). The last time that plaintiff worked was in November of 2016. (T. 60). She testified that she was "out of work" between April of 2015 and December 2015, but went back to work from

---

[2] Plaintiff was 51 at the time of the amended onset date.

December of 2015 until November of 2016. During that time, plaintiff took twelve weeks of Family and Medical Leave ("FMLA") from July 2016 until September 2016. (*Id.*) From April of 2015 to the time she stopped working completely, plaintiff testified that she was hospitalized for mental health issues several times, some of which were due to "Lithium toxicity." (T. 62).

Plaintiff testified that her symptoms include extreme irritability, anxiety, panic, hostility, depression, and mania. (T. 63). Plaintiff is treated with medication by a nurse practitioner, and she sees a therapist weekly. (*Id.*) Plaintiff also testified that she has had mental problems since childhood, but that now, "even on a daily basis," she was irritable and did not know when she was "going to explode or when something is going to happen." (T. 64). Plaintiff testified that in November of 2016, when she was let go from her last job, she had been "getting in trouble" with her boss, had been "written up," and had been called into the Human Resources Office multiple times. (T. 65). She got into a "shouting match" with her boss and "scared the new employees." (*Id.*) Although plaintiff asked for a change in position, she was told that was not possible, and instead, she was told not to return to work the next day. (*Id.*) She was ultimately told that she was being fired because of all the incidents. (*Id.*)

Plaintiff testified that on a typical day, she tries to get out of bed and get her son ready for school, but that she gets really aggravated because "things are not going right in the morning." (T. 67). Plaintiff then just tries to do "a little something during the day," including using the computer for a short time. (T. 67). Plaintiff testified that "a couple times a week," the dishes piled up, she did not take a shower, or do anything else "for days." (*Id.*) Then she tells herself that "I got to pull myself together, . . . or I

got to see somebody." (*Id.*) Plaintiff stated that the household chores were "shared," but that she would get angry with her husband when he was not "doing it right," and they would have a "huge argument," or she would "constantly cut" herself because she was irritated that something was not being done properly. (*Id.*)

Plaintiff stated that she did not socialize at all, but liked to garden as a hobby. (T. 68). Plaintiff went grocery shopping with her husband or had her sister pick her up if her sister was "out and about." (*Id.*) Plaintiff testified that she did not like being around "a lot" of people, and that she would occasionally have panic attacks, but that her medication helped to make the attacks less frequent. (T. 69). She would begin to feel panicky if she even thought about taking her son to an event, and she would have to take "an extra pill" so that she could attend the function. (*Id.*) Plaintiff testified that she did not sleep well, was up three or four times per night, and as a result, was tired all day. (T. 69-70).

Plaintiff stated that she went back to work in 2015 because she needed the money, but that she probably should not have attempted it, and at least one of her health care providers had counseled against it. (T. 71). At the hearing plaintiff testified that she was 5'9" tall and weighed 235 pounds. (*Id.*) Plaintiff takes various medications, and she testified that sometimes her husband must remind her to take them, but that she still might miss a dose. (T. 73). Plaintiff testified that the side effects of her medication included weight gain and a lack of mental clarity. (*Id.*)

Plaintiff stated that, since 2015, her condition had been a "roller coaster," and although she did not believe that she was "better," she had "come to a plateau with ups and downs." (T. 74). Plaintiff testified that reading was difficult for her because she

did not remember what she read. (*Id.*) She stated that she would try to do some "computer stuff," and that she would look at something for her husband if he asked her. (*Id.*) However, she stated that she could not sit for a long time going over materials, and she had to take a lot of notes so that she could "have it for him," because she would not remember "it." (*Id.*) She did not watch movies, and would turn the television on "more for company than to really sit and watch." (*Id.*)

Plaintiff testified that she went to Zimbabwe to visit her mother-in-law "last year for the very first time." (T. 75). Plaintiff stated that her primary care physician gave her some extra medication so that she could make the trip. (*Id.*) She said that taking the airplane was difficult, and that she had to use extra medication for the anxiety, claustrophobia, and panic that she felt. (T. 76). Plaintiff stated that therapy was helping her. (*Id.*)

The ALJ heard testimony from VE Linda Stein. (T. 77-81). The VE considered plaintiff's past relevant work experience as a registered nurse, case manager, and unit manager. (T. 78-79). The ALJ asked the VE to assume an individual of plaintiff's age, education, and past work experience, with no exertional limitations, but who was limited to understanding, remembering, and carrying out simple routine and repetitive non-complex tasks with occasional contact with supervisors, coworkers, and the general public. (T. 80). The VE testified that such an individual could not perform the plaintiff's past relevant work, but there were "unskilled" positions that the individual could perform: a hand bander, an inspector and hand packager, and a linen room attendant. (*Id.*) However, if the individual were "off-task" for more than 15% of the workday due to lack of concentration, focus, and inability to remember things, or if she

7

were likely to miss more than four days of work per month, that person would not be able to perform any work in the national economy. (T. 81).

The ALJ's decision and the plaintiff's brief provide a detailed statement of the medical and other evidence of record. (T. 10-24; Pl.'s Br. at 6-18 (Dkt. No. 9)). Defendant has adopted these recitations, with the exception of any legal conclusions stated or implied in plaintiff's brief. (Def.'s Br. at 3) (Dkt. No. 10). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. <u>THE ALJ'S DECISION</u>

At step one of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the amended onset date of July 1, 2016. (T. 13). At step two, the ALJ found the following severe impairments: bipolar disorder, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder. (*Id.*) To the extent that plaintiff had physical impairments, the ALJ found that they were not "severe."[3] (*Id.*)

At step three of the analysis, the ALJ found that the severity of plaintiff's impairments did not meet or medically equal a Listed Impairment. (T. 14). In making this determination, the ALJ considered Listing 12.04 (Depressive, Bipolar, and Related

---

[3] Plaintiff had a history of obesity, hypothyroidism, hypertension, prediabetes, diabetes insipidus, obstructive sleep apnea, and asymptomatic human immunodeficiency virus ("HIV"). (T. 13). The ALJ reasoned that except for the sleep apnea and the prediabetes, plaintiff had the other impairments long before the alleged onset date, and there was no indication in the record that any of the non-severe impairments limited her ability to perform her past relevant work. (*Id.*) The ALJ noted that she also considered plaintiff's obesity in accordance with Social Security Ruling ("SSR") 02-1p. The ALJ found that "there is almost no evidence that her obesity significantly affected her ability to function mentally or physically. (T. 13-14).

Disorders); 12.06 (Anxiety and Obsessive Compulsive Disorders); and 12.08 (Personality and Impulse Control Disorders). *See* 20 C.F.R. Pt. 404, Subpt. P, App.1. The ALJ found that plaintiff's condition did not satisfy the "paragraph B" criteria of any of the three Listings. (T. 14). The ALJ found that plaintiff did not have at least one extreme or two marked limitations in the four broad areas of functioning, which would satisfy the Listings' requirements. (T. 14-15). The ALJ also considered whether the "paragraph C" criteria of Listings 12.04 and 12.06 were satisfied.[4] (T. 15). The ALJ determined that plaintiff's activities of daily living and the mental status examination findings and treatment notes from the relevant period failed to show that the plaintiff experienced "marginal adjustment" as defined in Listing 1.00(G)(2)(c), and as required to satisfy the paragraph C criteria of Listings 12.04 and 12.06. (T. 15). The ALJ also noted that no State agency psychological consultant "concluded that a mental listing is medically equaled." (*Id.*)

At step four of the sequential analysis, the ALJ found that the plaintiff had the physical residual functional capacity ("RFC") for work at all exertional levels, but would be limited mentally to work which involved "understanding, remembering, and carrying out simple, routine, and repetitive, non-complex tasks with occasional contact with supervisors, co-workers, and the general public." (T. 16). In making this determination, the ALJ reviewed the evidence, considering, and giving relative weight to, the medical opinions in the record. (T. 20-22). The ALJ then found that, based on the plaintiff's RFC, she could no longer perform her past relevant work, but based on the testimony of the VE, at step five, the plaintiff could still perform jobs which exist in

_____

[4] Listing 12.08 does not contain a "paragraph C."

significant numbers in the national economy. (T. 22-23).

V.    **ISSUES IN CONTENTION**

Plaintiff raises the following arguments:

1.    Plaintiff's impairments met or equaled the severity of Listings 12.04, 12.06, and 12.08. (Pl.'s Br. at 20-21).

2.    The ALJ failed to properly analyze the medical evidence of record. (Pl.'s Br. at 21-24).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 3-12). For the following reasons, this court agrees with defendant and will dismiss plaintiff's complaint.

VI.    **LISTED IMPAIRMENT**

A.    **Legal Standard**

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is the plaintiff's burden to establish that his or her medical condition or conditions meet all of the specific medical criteria of particular listed impairments. *Pratt v. Astrue,* No. 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

B.    **Application**

The ALJ first found that plaintiff did not meet the "paragraph B" criteria, which

are the same for all three of the Listings above. (T. 14-15). In order to meet these criteria, the plaintiff must have either one "extreme" or two "marked" limitations in the four broad areas of functioning. *See e.g.* 20 C.F.R. Pt. 404, Subpt. P., App.1 § 12.04(B) (1)-(B) (4). These broad areas of functioning are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.[5] The ALJ found that plaintiff had only "moderate" restrictions in all four of the broad areas of functioning. (*Id.*) The ALJ also found that plaintiff did not meet the "C" criteria of Listings 12.04 and 12.06. Listing 12.08 does not contain any "C" criteria.

Plaintiff argues that the record is "replete" with "medical and other evidence" that plaintiff meets all the requirements of the three Listed Impairments. (Pl.'s Br. at 21). With respect to the "B" criteria, while it is true that some of plaintiff's treating and other medical sources have indicated that plaintiff has "marked" impairments in one or more of the four broad areas of functioning, there is other evidence in the record, and evaluated by the ALJ, which contradicts these findings.

### 1. Understanding, Remembering, or Applying Information

---

[5] Recently, the Social Security Administration made changes to the broad areas of functioning in the mental Listings. Prior to January 17, 2017, the four broad functional areas were: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § Pt. 404, Subpt. P, Appx. 1 (2016). *Genua v. Comm'r of Soc. Sec.*, No. 18-CV-423, 2019 WL 2019 WL 5691827, at *4 (W.D.N.Y. Nov. 4, 2019). After January 17, 2017, the four functional areas were amended to: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* (citing 20 C.F.R. § 416.920a(c)(3)). In making the assessment regarding these functional areas, the ALJ must determine the degree of limitation using a five-point scale consisting of "'none, mild, moderate, marked, and extreme.'" *Id.* (quoting 20 C.F.R. § 416.920a (c)(4)). The court applies the rules in effect at the time of the ALJ's decision. *Id.* (citation omitted). In this case, the ALJ's decision was issued on October 31, 2017. (T. 24). Thus, the new rules apply, and the B criteria no longer contain any reference to "episodes of decompensation."

With respect to understanding, remembering or applying information, the ALJ's determination that plaintiff had only a "moderate" impairment is supported by substantial evidence. Plaintiff stated that she had a "memory" problem, but as the ALJ pointed out, plaintiff started learning photography after losing her job in November of 2016, and was able to apply for, and obtain a federal grant in 2017 to start a new business. (T. 14). In addition, the court notes that plaintiff's psychiatric Nurse Practitioner ("NP"), Terisi Hershowitz's Medical Source Statement ("MSS") indicated that plaintiff had an "unlimited or very good" ability to "remember work-like procedures;" and "understand and remember," both short and simple instructions and detailed instructions. (T. 1079-80). NP Hershowitz's MSS also indicated that plaintiff had an "unlimited or very good" ability to "***carry out***" both simple and detailed instructions in addition to an "unlimited or very good" ability to make simple, work-related decisions. (*Id.*) (emphasis added).

A review of NP Hershkowitz's treatment notes supports this determination. On April 20, 2017, NP Hershkowitz reported that plaintiff's concentration, and immediate short and long term memory were all "intact." (T. 896). Abstractions, insight, judgment, and impulse control were all "intact." (*Id.*) The same findings regarding concentration, memory, abstractions, judgment, and impulse control were made on November 10, 2016, December 15, 2016, January 19, 2017, and February 22, 2017. (T. 897-900). Dr. Stack found that plaintiff had "no evidence of limitation in her ability to understand, remember or apply simple directions and instructions or maintain personal hygiene and attire, even though he found a "moderate" limitation with respect to "complex" directions and instructions. (T. 890). Thus, the ALJ's finding regarding the

first broad area of functioning is supported by substantial evidence.

## 2. Interacting With Others

The second broad area of functioning in paragraph B is the ability to "interact with others." Plaintiff argues that Dr. Lauren Stack, Ph.D., a consultative psychologist to whom the ALJ ultimately gave "great weight," found "marked" limitations in interacting adequately with supervisors, co-workers, and the public. (T. 890, 894). NP Hershkowitz also found that plaintiff had marked limitations in the ability to get along with supervisors and co-workers. (T. 1079).

An ALJ may accept parts of a doctor's opinion and reject others. *Camile v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016) (citations omitted). Notwithstanding Dr. Stack's and NP Hershkowitz's finding that plaintiff had a "marked" limitation in social interaction, the ALJ found only a "moderate" limitation for Listing purposes, based upon the plaintiff's ability to live with her husband and son, travel with them for a month to Zimbabwe, and relate and interact appropriately with her "multiple" treatment providers and examining sources. (T. 15).

The court finds that plaintiff's ability to live with her husband and son and to relate properly to her medical providers does not necessarily preclude a "marked" limitation in social interaction. However, a review of the record shows that on September 9, 2016, Licenced Social Worker ("LCSW") Henny de Knegt wrote in a progress note that plaintiff "[h]ad a good trip to Zimbabwe to meet husband's family and tour. . . . [She] coped constructively with the apprehensions she had before going (via Ativan, holding her husband's hand, having accessibility to a private space, enjoying the children of the family)." (T. 1071). Plaintiff expressed concern about

13

returning to work because "full time is more stressful than part-time, [and] feels pressured to financially provide for the family." (*Id.*) Plaintiff's therapist also noted that plaintiff's strengths were "photography, [and she] likes adventure (new places to see new things) . . . ." (*Id.*) On January 27, 2017, plaintiff told LSCW Knegt that she "'met with photography group to discuss ideas,' talked about a cousin who was dying, [and stated that] she had been assisting the family with negotiating the medical and hospice systems." (T. 1057).

On February 16, 2017, plaintiff told her therapist that she had "helped set up her cousin with hospice and feels settled about this." (T. 1055). She also told her therapist that she had a "get together with prior co-workers." (*Id.*) On March 17, 2017, plaintiff told her therapist that she had a number of stressors, including her cousin dying, her unemployment, and her son's defiance. (T. 1053). She expressed concerns about how her behaviors, (i.e. her "rages") would affect her son. (*Id.*) Plaintiff stated that she did not wish to return to nursing because of "external factors that distress her." (*Id.*) However, plaintiff also stated that she had applied for a "SEED grant via [the] dept of labor and [she was] waiting to hear." (*Id.*)

On March 30, 2017, plaintiff told her therapist that she attended her cousin's funeral, and she was somewhat disappointed in his mother's "coldness." (T 1052). She was also disappointed with other aspects of the funeral, "but appreciated seeing his old friends and family." (*Id.*) Plaintiff also "hosted a traditional family dinner," although she was disappointed in her siblings' behavior, felt criticized, and felt her son was unfairly criticized. (*Id.*) Plaintiff had received the grant for which she applied, but was concerned about enacting the plan. (*Id.*) Although a social worker is not an "acceptable

medical source" for purposes of the diagnosis or establishment of an impairment, the regulations state that these providers may be considered when determining the limitations that an impairment imposes on the plaintiff.[6] 20 C.F.R. § 404. 1527(f); SSR 06-03p.

In any event, the above mentioned statements are those of the plaintiff that were repeated in her therapist's treatment notes. The statements plaintiff made to her therapist about her activities support the ALJ's finding that plaintiff is only moderately limited in social functioning for purposes of a Listed Impairment. While the court does not question the fact that plaintiff has limitations on social functioning which could affect the RFC determination at step four, the ALJ's determination at step three that these limitations were moderate, rather than "marked" is supported by substantial evidence in the record.[7]

### 3. Concentrating, Persisting, or Maintaining Pace

The third broad area of functioning is concentrating, persisting, or maintaining pace. The ALJ found a moderate limitation in this area, based, in part, on plaintiff's ability to drive, her ability to learn about photography, her ability to apply for a grant to start a new business in 2017, and her ability to assist family members with hospice

---

[6] "The opinions of these 'other sources' may be considered by the ALJ when assessing the severity of claimant's impairment and ability to work, but they do not need to be given controlling weight." *Sullivan v. Comm'r of Soc. Sec.*, No. 1:18-CV-00871, 2019 WL 5691811, at *5 (W.D.N.Y. Nov. 2, 2019) (quoting *Genier v. Astrue*, 298 F. App'x 105, 108 (2d. Cir. 2008)).

[7] Even if the ALJ was incorrect in determining that plaintiff did not have a "marked" impairment in social functioning, the ALJ's Listing determination would still be supported by substantial evidence because in order to meet the B criteria, the plaintiff would have to have two marked limitations or one extreme limitation in the broad areas of functioning. As discussed herein, the moderate limitations are supported by substantial evidence in the record.

placement for her cousin. (T. 15).  In addition, although NP Hershkowitz stated that plaintiff had a "marked" limitation in this area, Dr. Stack found only a moderate limitation. (T. 890 - Dr. Stack; T. 1081 - NP Hershkowitz).  In Dr. Stack's MSS, she stated that the ability to concentrate, persist, or maintain pace and the ability to adapt or manage oneself were *not* affected by plaintiff's impairment.[8] (T. 894).  Conflicts in the evidence are for the ALJ to resolve. *Veino v. Barnhart*, , 312 F.3d 578, 588 (2d Cir. 2002).  In addition, the court notes that on the same day that NP Hershkowitz wrote her MSS, checking the box in which she finds a "marked" limitation in the ability to concentrate, her contemporaneous treatment notes state that plaintiff's concentration is "intact." (*Compare* T. 1081 *with* T. 896).[9]  This clear inconsistency between NP Hershkowitz's MSS, dated April 20, 2017 and her treatment notes of the same day, provide support for the ALJ's determination to find only moderate limitations in plaintiff's ability to concentrate, persist, and maintain pace.

### 4.    Adapting or Managing Oneself

Finally, the fourth area of broad functioning involves adapting and managing oneself.  The ability to regulate emotions, control behavior, and maintain well-being are included in this fourth broad area of functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E(4).  Again, the ALJ found only a moderate limitation. (T. 15).  The ALJ stated that, although plaintiff alleged having difficulties handling stress and controlling

---

[8] Plaintiff cites a consultative examiner Dr. Alex Gindes's  August 4, 2015 opinion, in which he states that plaintiff's concentration and ability to deal with stress were "markedly" limited. (T. 413). This opinion was written before plaintiff's onset date and conflicts with other evidence of record.

[9] "Concentration is intact.  Immediate, short term, and long term memory are intact. Abstractions are intact.  Insight was intact.  Judgment was intact.  Impulse control was intact." (T. 896).

her mood and anxiety symptoms, the medical evidence showed that her mental impairment symptoms remained "reasonably stable" and well-controlled when she was compliant with treatment recommendations." (*Id.*)  The ALJ also relied upon plaintiff's ability perform a wide range of activities of daily living, supporting her finding that plaintiff had only a moderate limitation in adapting or managing herself.  In fact, although Dr. Stack found that plaintiff's limitations in responding appropriately in usual work situations and to changes in a routine work setting were "marked," in the next paragraph of the MSS, she found that plaintiff's ability to "adapt and manage [herself]" were not affected at all by her impairment. (T. 894).  NP Hershkowitz found that plaintiff's ability to respond appropriately to changes in a work setting were "limited but satisfactory." (T. 1079).

The court notes that plaintiff traveled to Zimbabwe for a month with her family. Although it appears that she needed extra medication and used other coping mechanisms, she told her therapist that she had a good vacation and was clearly able to adapt to a new routine.  Plaintiff was also learning to be a photographer after she lost her job as a nurse.  Finally, plaintiff was able to assist a member of her family in obtaining hospice placement, and was able to apply for, and obtain, a grant to start a new business in 2017.  These activities show the ability to adapt.

There was evidence that plaintiff had trouble regulating her emotions and had angry outbursts.  The ALJ found that when plaintiff complied with her medication, her mental impairment symptoms "remained reasonably stable and well controlled." (T. 15).  Plaintiff had various hospitalizations, some of which were prior to the amended date of onset.  Many of them were due to medication imbalance.  The court notes that

17

the Lithium toxicity was often due to dehydration. (T. 429, 442, 538). Once plaintiff's levels were adjusted, her condition, and her ability to control her emotions and impulses improved. The court does not question that plaintiff has limitations, which will be discussed in the RFC section below, but rather that the ALJ's determination that plaintiff did not meet a listed impairment was supported by substantial evidence.

### 5. Paragraph C

The ALJ also considered paragraph C of the Listings 12.04 and 12.06.[10] Paragraph C requires that the plaintiff's mental disorder be "serious and persistent," lasting at least two years, and there must also be medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that is ongoing and diminishes the symptoms and signs of the mental disorder ***and*** there must be "marginal adjustment."[11] Listings §§ 12.04(C)(1) & (2), 12.06(C)(1) & (2). Marginal adjustment is defined as minimal capacity to adapt to changes in the individual's environment or to demands that are already a part of the individual's daily life. *Id.* § 12.04(C)(2) & 12.06(C)(2).

Plaintiff certainly has a long-standing mental impairment. However, the ALJ found that the plaintiff's activities, mental status examination findings, and treatment notes failed to show that plaintiff experienced "marginal adjustment." (T. 15). The

---

[10] As stated above, Listing 12.08 does not contain a paragraph C.

[11] Plaintiff argues that each hospitalization should count as a period of "decompensation," required for paragraph C. (Pl.'s Br. at 21 n.5). However, the version of the Listings in effect at the time of the ALJ's decision, no longer contains a reference to decompensation. The court would also point out that plaintiff's hospitalizations often were due to Lithium toxicity, not always caused by plaintiff's voluntary actions. There is evidence in the record that plaintiff's Lithium levels were affected by dehydration, and that after plaintiff's levels were adjusted or plaintiff was taken off her Lithium for a brief time, her symptoms stabilized. (*See* T. 430-31, 442).

ALJ's finding that plaintiff did not experience "marginal adjustment" is supported by substantial evidence. In order to experience marginal adjustment, any changes in a plaintiff's environment must have led to a deterioration in functioning, and an inability to function outside the home or led to a "significant" change in medication or other treatment. *Figueroa v. Saul*, No. 18-CV-4534, 2019 WL 4740619, at *23 (S.D.N.Y. Sept. 27, 2019) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(G)(2) (c)). Plaintiff's successful trip to Zimbabwe alone, with only some "extra medication" and other coping mechanisms shows that plaintiff was able to adjust to changes in her environment. Thus, the ALJ's Listing determination is also supported by substantial evidence.

## VII. <u>Analysis of Medical Evidence</u>

### A. **Legal Standards**

#### 1. **RFC**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). RFC can only be established when there is

substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

A treating physician's opinion is not binding on the Commissioner, and the opinion must be only given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

When assigning less than "controlling weight" to a treating physician's opinion, the ALJ must "explicitly consider" the four factors listed in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95-96 (citation omitted). A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review

of the record shows that the ALJ has provided "good reasons" for her evaluation. *Id.* at 96.

## B. Application

Plaintiff's citations to the record are generally correct, and there is no question that plaintiff suffers from severe mental impairments, resulting in functional limitations. The record contains a great many medical reports and treatment notes from before and after plaintiff's alleged amended onset date. However, the ALJ properly analyzed, and gave weight to, the medical opinions in the record. In making the RFC determination, the ALJ carefully analyzed the medical evidence, giving a specific weight to each of the relevant providers. (T. 19-22). The ALJ gave "great weight" to examining consultative psychologist, Dr. Stack. (T. 20). The ALJ may assign "great weight" to a medical source's opinion without adopting it in its entirety. *Fiducia v. Comm'r of Soc. Sec.*, No. 1:13-CV-285, 2015 WL 4078192, at *3 (N.D.N.Y. July 2, 2015) (citing *Jones v. Colvin*, No. 1:13-CV-1214, 2014 WL 3728939 at *5-6 (N.D.N.Y. July 25, 2014)).

Even though Dr. Stack stated that plaintiff would have had "marked" limitations in her social functioning, and the ALJ found only moderate limitations for purposes of a Listed Impairment, in her RFC determination, the ALJ specifically stated that she "adequately accounted for the ***marked*** social limitations that Dr. Stack indicated" by finding that plaintiff could have only occasional contact with supervisors, co-workers, and the public. (T. 20) (emphasis added). In *Fiducia,* 2015 WL 4078192, at *4, the court held that "[t]he fact that plaintiff was found to have a ***marked limitation interacting with others*** does not conclusively demonstrate that she is unable to work, particularly given the fact that the ALJ limited plaintiff to work that *does not require*

21

*more than occasional interaction with the public and co-workers.*" *Id.* (emphasis added). The facts in *Fiducia* are very similar to this case, and the court's decision fully supports the ALJ's finding herein.

The plaintiff cites to the "treating physician" rule, but the ALJ specifically addressed the weight that he gave to plaintiff's treating sources, some of whom gave their restrictive opinions about plaintiff's functional abilities long before plaintiff's July 1, 2016 amended onset date. Plaintiff's counsel cites Dr. Carlos Valle's June 5, 2015 opinion that plaintiff had been unable to work since April 24, 2015 and would continue to be unable to work until at least June 5, 2016. (Pl.'s Br. at 22).

It is true that on June 5, 2015, Dr. Valle completed a form in which he stated that plaintiff had been unable to work beginning April 24, 2015. (T. 418). Plaintiff saw Dr. Valle in conjunction with a mental health program to which she was referred by Dr. Michael Sheran, M.D., her primary care physician. (T. 454). Dr. Valle treated plaintiff from May 14, 2015 until the date of his report, dated June 5, 2015. (T. 418). The form asked whether plaintiff could perform "his/her *regular* occupation," and Dr. Valle wrote "<u>no.</u>" (T. 418) (emphasis added). The form then asked for the patient's "estimated recovery date," and Dr. Valle responded that this date was "unknown - at least 1 year 6/15/16." (*Id.*)

This document, signed by Dr. Valle in 2015, appears to only state that plaintiff could not perform her "regular" occupation. The ALJ agreed that plaintiff could not perform her past relevant work. Clearly the job of a hospice nurse is a stressful occupation. During one of plaintiff's 2015 hospital admissions, she remarked how stressful the job was. (T. 474). It does not appear that Dr. Valle treated plaintiff after

22

the June 5, 2015 report, which was authored long before the plaintiff's amended onset date.[12]

Plaintiff also argues that NP Hershkowitz indicated that plaintiff was "incapacitated" from November 14, 2014 until November 4, 2015. (Pl.'s Br. 22) (citing T. 537). She also issued a very restrictive MSS, dated April 20, 2017, finding that plaintiff could not meet competitive standards in a variety of areas. (T. 1077-82). NP Hershkowitz was not an "acceptable medical source" for purposes of the treating physician rule, but her opinion may be considered in determining the limitations that an impairment may impose on a plaintiff. *See Morgan v. Comm'r of Soc. Sec.*, No. 1:18-CV-884, 2019 WL 6337528, at *5 (W.D.N.Y. Nov. 27, 2019) (citations omitted).

The ALJ mentioned that NP Hershdowitz was not an acceptable medical source, but still gave her opinions and notes "some weight" because "she did examine [plaintiff] on multiple occasions and treat [plaintiff] for most of the relevant period at issue." (T. 21). The ALJ noted that to the extent that both Dr. Stack and NP Hershkowitz found that plaintiff would be unable to handle "normal work related stress involved in unskilled work," the "objective clinical findings, and reported activities of

---

[12] The ALJ did not specifically discuss Dr. Valle, his June 5, 2015, report or any of Dr. Valle's treatment notes. The ALJ did specifically state that it was "important to clarify" that the relevant period at issue was from July 1, 2016 until the date of the ALJ's decision. (T. 17). The ALJ stated that she considered all the medical evidence, but that there was no need to refer to the evidence predating the amended onset date. (*Id.*) However, to the extent that she did refer to prior evidence, the ALJ was doing so only to "establish the degree of severity of the claimant's impairments during the relevant period and to assess the overall consistency of her statements with the record as a whole." (*Id.*) Since Dr. Valle did not treat plaintiff after 2015, his otpinion and related reports were not specifically addressed or given weight by the ALJ in her decision.

daily living from the relevant period do not support [that conclusion] . . . ."[13] (*Id.*)

Plaintiff also bases her arguments on Dr. Sheran's reports. Dr. Sheran's MSS was dated April 12, 2012, four years prior to the amended onset date. (T. 1083-88). Plaintiff returned to her previous work after Dr. Sheran's April 22, 2012 opinion was issued. The ALJ specifically stated that she gave "some" weight to Dr. Sheran's MSS dated April 22, 2012, in which Dr. Sheran opined that plaintiff could not meet competitive standards in many areas, having significant limitations. (T. 21). In accordance with the *Burgess* factors cited above, the ALJ correctly found that although Dr. Sheran is a treating source, "he is not a mental health specialist," he provided "this" opinion well before the relevant time period, and the "significant" mental limitations are inconsistent with the objective clinical findings and other medical evidence from the relevant period. (T. 21). The ALJ also noted that the daily activities reported by the plaintiff and the examination findings provided by Nurse Hershkowitz and Dr. Stack indicated that plaintiff was less limited in mental functioning than Dr. Sheran indicated.[14]

---

[13] This is particularly true of NP Hershowitz's restrictive MSS. As stated above, on the same day that NP Hershowitz found that plaintiff could not meet competitive standards for many activities, she also found in her contemporaneous treatment notes that plaintiff's concentration; immediate, short-term, and long term memory; abstractions, insight, judgment, and impulse control, were "*intact.*" (T. 896, 1081).

[14] The court notes that Dr. Sheran was the only medical professional who commented on plaintiff's alleged inability to stay "on task" or who found that she would be absent from work four days per month due to her impairments. (T. 1088). As stated above, the ALJ properly discounted Dr. Sheran's opinion, issued in 2012, in accordance with *Burgess*. Although not noted by the parties, the court notes that Dr. Sheran's 2012 MSS shows the problem with "check box forms." In the section dealing with "unskilled work," Dr. Sheran checks the box indicating that plaintiff was "unable to meet competitive standards" in her ability to "deal with normal work stress." (T. 1085). However, on the next page, dealing with "semi-skilled" and "skilled work," Dr. Sheran checks boxes stating that plaintiff would have "limited but satisfactory" abilities in the areas of dealing with "the stress of semi-skilled and skilled" work; understanding, remembering, and carrying out detailed instructions, setting

Dr. Sheran continued to see plaintiff in 2016, and issued various reports during and after the plaintiff was hospitalized, and prior to her beginning to see NP Hershkowitz. (*See* T. 1098- 1125). Dr. Sheran noted on May 24, 2016 that plaintiff had gone back to work, but felt like she was too somnolent to drive. (T. 1098). Dr. Sheran stated that plaintiff was not at that time seeing a psychiatrist who could manage her medications, but that he would continue to prescribe "until she got [a] provider."[15] (T. 1100). Although plaintiff presented as "angry and agitated," Dr. Sheran noted that her mood was less angry and agitated and had "improved since the last visit." (*Id.*). He advised her not to drive while sleepy. (T. 1101).

In June of 2016, after "back to back" hospitalizations, Dr. Sheran noted that plaintiff was having trouble with the Lithium. (T. 1106). On June 7, 2016, Dr. Sheran noted that plaintiff's mood was "improved since the last visit," notwithstanding the issues she was having with her medications. (T. 1111). Plaintiff argues that, in July of 2016, Dr. Sheran stated that plaintiff should not be working and was not stable enough to travel to Zimbabwe. (Pl.'s Br. at 25) (citing T. 1119-21). However, plaintiff did travel to Zimbabwe, told her therapist that she had a good time, and was able to use coping mechanisms to deal with her anxiety.

On July 15, 2016, plaintiff asked for the Lithium, because she believed that it was the only thing that helped, but Dr. Sheran did not prescribe the Lithium, due to the

---

realistic goals and making plans independent of others. (T. 1086). Clearly there is inconsistency in Dr. Sheran's MSS form. One cannot be unable to meet competitive standards for unskilled work, while having "limited but satisfactory" ability to perform the mental capabilities of "semi-skilled and skilled" work.

[15] Dr. Sheran stated that plaintiff's psychiatrist "left," and she had not yet been provided with a new one. (T. 1106).

issues that plaintiff had with toxicity. (T. 1113, 1115). However, in a "pre-travel" report, dated July 14, 2016, signed by Mark A. Tack, D.O., plaintiff reported "no complaints." (T. 1116). She was "cooperative," and her "overall behavior" was "appropriate." (T. 1117). In September of 2016, after plaintiff's trip and after plaintiff began treating with NP Hershkowitz, Dr. Sheran noted that plaintiff was feeling much better than she was in July and early August. (T. 1122). She was "no longer feeling agitated," and she felt "calm." (*Id.*) Her mood was "normal," and her thought processes, intact. (T. 1123). The ALJ was presented with conflicting evidence, and it is clear that during some time in 2016, plaintiff was having trouble managing her medications, in part because she was between psychiatrists. However, the ALJ properly considered all the evidence, and the ALJ's determination to give Dr. Sheran's 2012 MSS only "some" weight is supported by substantial evidence.

The court notes that, although the ALJ accounted for Dr. Stack's finding that plaintiff would have "marked" difficulties with social interaction, the ALJ did not specifically mention Dr. Stack's finding that plaintiff would have "marked" limitation in the ability to respond appropriately to usual work situations and to changes in a work setting. (T. 894). This limitation was included in Dr. Stack's opinion regarding social interaction. (*Id.*) The fact that the ALJ did not mention a portion of Dr. Stack's report does not indicate that it was not considered since the ALJ specifically stated that she "adequately accounted for the marked social limitations that Dr. Stack indicated in finding the claimant to be limited to understanding, remembering, and carrying out simple, routine, and repetitive, non-complex tasks with occasional contact with supervisors, co-workers, and the general public." (T. 20). The ALJ also stated that the

"objective clinical findings and routine treatment evidence from the relevant period, together with the activities of daily living reported by the claimant support the conclusion that she is capable of performing work without greater limitations." (*Id.*)

In addition, in her report, Dr. Stack also found that, other than social interaction, no other capabilities "such as the ability to concentrate, persist, or maintain pace and the ability to adapt or manage oneself" were affected at all. (*Id.*) In fact, although in her April 20, 2017 MSS, NP Hershkowitz found that plaintiff was "seriously limited, but not precluded in her ability to maintain regular attendance and be punctual within customary, usually strict tolerance," she also found that plaintiff's ability to respond appropriately to changes in a routine work setting was "limited but satisfactory."[16] (T. 1079). Once again, the ALJ was presented with conflicting evidence, which she considered, and any failure to specifically mention one of Dr. Stack's findings, given the other cited evidence of record is not an error requiring remand. Thus, the weight that the ALJ gave to the medical records and the ALJ's ultimate RFC determination did

---

[16] The court also notes that in the narrative part of NP Hershkowitz's April 20, 2017 MSS, she was asked to explain the limitations falling in the "most limited categories." (T. 1079). NP Hershkowitz wrote only about plaintiff's "difficulty" in dealing with "peers," "trust issues," and "difficulty" with authority, which increase anxiety and decrease the ability to work. (*Id.*) On the next page, NP Hershkowitz noted that plaintiff's perfectionism led to increased stress, and she was able to accept constructive criticism. (T. 1080). In the section of the report, dealing with plaintiff's ability to perform "particular" types of jobs," NP Hershkowitz rated plaintiff's abilities to maintain appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation as "Unlimited or Very Good." (T. 1080). She rated plaintiff as "Seriously limited, but not precluded in dealing with the public." (*Id.*) In the narrative portion of this section of the report, NP Hershkowitz specifically stated that "in *her position*, she is required to deal with difficult people and their emotions. This is difficult when she can't deal with her own." (*Id.*) This statement indicates that NP Hershkowitz may have been focusing on plaintiff's previous work, and not on other work that she might have been able to do, notwithstanding her impairment. In any event, as stated above, the ALJ properly resolved the conflicting evidence in making her RFC determination, and clearly considered plaintiff's limitations in dealing with co-workers, supervisors, and the public.

not violate the treating physician rule and was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk is directed to enter **JUDGMENT FOR DEFENDANT**.

Dated: December 13, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge